489 P.3d 1242
In re: The PEOPLE of the State of Colorado, Plaintiff,
v. Regina M. SPRINKLE, Defendant.
Supreme Court Case No. 21SA3 Supreme Court of Colorado.
June 28, 2021
Attorneys for Plaintiff: Office of the County, Attorney of El Paso County, Chris Strider, Assistant County Attorney, Mary Ritchie, Assistant County Attorney, Colorado Springs, Colorado
Attorneys for Defendant: Megan A. Ring, Public Defender, Stephanie Lalonde, Deputy Public Defender, Colorado Springs, Colorado
En banc
JUSTICE HOOD delivered the Opinion of the Court. ¶1 In this original proceeding, we review the district court's order requiring the El Paso County Sheriff's Office ("EPCSO") to give Regina M. Sprinkle access to internal investigation files about two of its deputies. EPCSO asks us to vacate the order and remand with instructions to quash the subpoena duces tecum ("SDT") that prompted this action.
¶2 We conclude that the district court properly exercised its subject matter jurisdiction in resolving this controversy through a hearing to show cause, as provided under the Colorado Criminal Justice Records Act ("CCJRA"), § 24-72-303, C.R.S. (2020), and correctly interpreted the CCJRA as requiring release of the records. In reaching this conclusion, we examine HB 19-1119, the Peace Officer Internal Investigations Open Records Act, now codified essentially as an amendment to the CCJRA at section 24-72-303(4)(a) (the "Amendment"). We hold that a records custodian for a criminal justice agency may not deny a request to inspect internal investigation files, as described in the Amendment, simply because the requestor has not referenced a "specific, identifiable incident" of alleged misconduct in the request. Accordingly, we discharge the rule.
I. Facts and Procedural History
¶3 In early 2020, the El Paso County District Attorney charged Sprinkle with several criminal offenses. The two EPCSO deputies whose files are at issue have been endorsed as witnesses, and Sprinkle claims their testimony is central to the case against her.
¶4 In preparation for trial, a defense investigator submitted a request to EPCSO "to inspect or obtain copies of Internal Affairs records that relate" to the two deputies; specifically, "any complaints filed, investigation reports completed and disciplinary actions taken or disposition records related to these [deputies]." EPCSO denied the request. After quoting the CCJRA, the denial letter explained that "requests must include a specific, identifiable incident of alleged misconduct involving the in-uniform and/or on-duty conduct of a peace officer and a member of the public. Your request is vague and does not meet ... the language of the [CCJRA], therefore your request is denied."
¶5 Sprinkle then subpoenaed the deputies' internal affairs records by filing an SDT. EPCSO moved to quash the SDT, and the district court held a hearing on the motion to quash.
¶6 At the hearing, the court observed that the request for these records seemed to fall under the CCJRA and so the denial of that request entitled Sprinkle to a show cause hearing. It then asked the EPCSO attorney, "[W]hat is your position on that?" The attorney responded, "We would ask, Judge, a show cause hearing be set." Sprinkle agreed to the hearing. The EPCSO attorney asked for two weeks to prepare, and the court gave him the time he requested.
¶7 Four days before the show cause hearing, however, EPCSO filed a motion claiming the court lacked subject matter jurisdiction. The court held the show cause hearing as scheduled but began with the parties' arguments on the subject-matter-jurisdiction objection. Based on the statutory grant of subject matter jurisdiction in section 24-72-303(4)(f) and the parties' stipulation to the show cause hearing, the court concluded that it had jurisdiction to resolve the merits. It then turned to interpretation of the CCJRA and ordered EPCSO to release the records to Sprinkle, subject only to the statutory exclusion of pending and ongoing investigations and the required redactions of personal information.
¶8 EPCSO petitioned this court under C.A.R. 21 for a rule to show cause, which we granted.
II. Analysis
¶9 We begin by discussing our jurisdiction to hear this matter and the applicable standard of review. We then analyze the district court's subject matter jurisdiction to resolve the parties' dispute under the CCJRA. After concluding that the district court had subject matter jurisdiction, we review its order requiring EPCSO to release the requested records. We perceive no error.
A. Original Jurisdiction and Standard of Review ¶10 Relief under Rule 21 is extraordinary and wholly within the discretion of this court. C.A.R. 21(a)(1). Such relief is appropriate "when an appellate remedy would be inadequate, when a party may otherwise suffer irreparable harm, or when a petition raises ‘issues of significant public importance that we have not yet considered.’ " People v. Rowell, 2019 CO 104, ¶ 9, 453 P.3d 1156, 1159 (quoting Wesp v. Everson, 33 P.3d 191, 194 (Colo. 2001) ). ¶11 We choose to exercise our original jurisdiction here for two reasons. First, EPCSO seeks relief from the district court's order to release internal investigation records to Sprinkle, and "the damage that could result from disclosure would occur regardless of the ultimate outcome of an appeal from a final judgment" in the underlying criminal case. People v. Kilgore, 2020 CO 6, ¶ 11, 455 P.3d 746, 749 (quoting Ortega v. Colo. Permanente Med. Grp., P.C., 265 P.3d 444, 447 (Colo. 2011) ). Second, the petition raises an important issue of statewide concern that we have not yet considered; namely, how to interpret a recent legislative change broadly affecting the public's access to certain criminal justice records. See § 24-72-301 ("The General Assembly hereby finds and declares that the ... dissemination ... of criminal justice records [is a] matter[ ] of statewide concern ...."). ¶12 The issues presented raise questions of jurisdiction and statutory interpretation, which are questions of law. Therefore, our review is de novo. In re J.C.T., 176 P.3d 726, 729 (Colo. 2007) ; Thompson v. People, 2020 CO 72, ¶ 22, 471 P.3d 1045, 1051.
B. Subject Matter Jurisdiction ¶13 EPCSO contends that the district court erred by exercising its subject matter jurisdiction in this case because Sprinkle failed to file the required application for a hearing to show cause under section 24-72-303(4)(f). We disagree. ¶14 "A court's ‘jurisdiction’ concerns its ‘power to entertain and to render a judgment on a particular claim’ "; put simply, "it is the court's power to decide." People v. C.O., 2017 CO 105, ¶ 21, 406 P.3d 853, 858 (quoting In re Estate of Ongaro, 998 P.2d 1097, 1103 (Colo. 2000) ). Jurisdiction consists of two parts: "jurisdiction over the subject matter of the issue to be decided (subject matter jurisdiction), and jurisdiction over the parties (personal jurisdiction)." Id. at ¶ 22, 406 P.3d at 858. Only subject matter jurisdiction is at issue here. ¶15 " ‘[S]ubject matter jurisdiction’ concerns the court's authority to deal with the class of cases in which it renders judgment, not its authority to enter a particular judgment within that class." Id. at ¶ 24, 406 P.3d at 858 ; see Wood v. People, 255 P.3d 1136, 1140 (Colo. 2011) ("A court has subject matter jurisdiction where it has been empowered to entertain the type of case before it by the sovereign from which the court derives its authority.").
¶16 District courts are courts of general jurisdiction, meaning they "have original jurisdiction in all civil, probate, and criminal cases." Colo. Const. art. VI, § 9 (1). The General Assembly has also specifically granted district courts subject matter jurisdiction over denials of requests for records of completed internal investigations:
Any person who has been denied access to any information in a completed internal affairs investigation file may file an application in the district court in the county where the records are located for an order directing the custodian thereof to show cause why the withheld or redacted information should not be made available to the applicant. § 24-72-303(4)(f). Because this criminal case involving the denial of a CCJRA request clearly falls within the class of cases the district court is authorized to hear, the district court had subject matter jurisdiction. See C.O., ¶ 25, 406 P.3d at 858-59. ¶17 However, "[i]t is not sufficient that the court has, in the abstract, the authority to decide the particular class of case which is before it. The court's authority must be invoked before it can act." In re Marriage of Stroud, 631 P.2d 168, 171 (Colo. 1981) ; accord People in Int. of Clinton, 762 P.2d 1381, 1387 (Colo. 1988). Section 24-72-303(4)(f) provides that parties may file an application in the district court for review of a denial of a CCJRA request, so we must determine if the filing of an application is necessary to invoke the district court's subject matter jurisdiction, or if it is simply a non-jurisdictional procedure. That distinction matters because subject matter jurisdiction cannot be waived or consented to by the parties, Mesa Cnty. Valley Sch. Dist. No. 51 v. Kelsey, 8 P.3d 1200, 1206 (Colo. 2000), but non-jurisdictional procedures can be, People in Int. of Lynch, 783 P.2d 848, 852-53 (Colo. 1989). ¶18 We conclude that filing an application is a non-jurisdictional procedure. The CCJRA provides that a person "may file an application." § 24-72-303(4)(f). So, this application-filing provision is simply one way that a party may invoke jurisdiction, not the only way. See Wood, 255 P.3d at 1140 ("Although the legislature has the power to limit courts' subject matter jurisdiction, we have held that such limitations must be explicit."). Nothing in section 24-72-303(4)(f) precludes a district court from reviewing a CCJRA denial when it does so as part of a proceeding over which the court already has subject matter jurisdiction. Accordingly, the application-filing provision is a non-jurisdictional procedure rather than a jurisdictional prerequisite.
¶19 And a non-jurisdictional procedure is all that the parties waived here. As part of the criminal case over which the court exercised its general subject matter jurisdiction, the district court had subject matter jurisdiction over the SDT and the related motion to quash, which implicated records encompassed by the CCJRA. At the pretrial hearing to discuss the SDT and motion to quash, the parties agreed to the show cause hearing to resolve their lingering CCJRA dispute. The parties' stipulation to a show cause hearing waived the non-jurisdictional procedural requirement of filing an application.
¶20 Accordingly, we conclude that Sprinkle's failure to file an application for a show cause hearing didn't divest the district court of subject matter jurisdiction in this case. Therefore, we turn to the merits.
C. The CCJRA Order ¶21 EPCSO also contends that the district court erred in its interpretation of the Amendment because, under EPCSO's interpretation, the Amendment requires the requesting party to itemize the "specific, identifiable incidents of official misconduct" that the requestor seeks to inspect. Again, we disagree. ¶22 In interpreting statutes, we seek to ascertain and give effect to the legislature's intent. Thompson, ¶ 22, 471 P.3d at 1051. To do so, we look first to the plain language of the statute, read the statute as a whole, and give its words and phrases their plain and ordinary meaning. Id. We read words and phrases in context and construe them according to the rules of grammar and common usage. Id. If the language is clear, we apply it as written. Id. If it is ambiguous, meaning it is susceptible to more than one reasonable interpretation, we may employ the traditional tools of statutory construction to aid our interpretation. Id. These tools include analysis of the statute's legislative history. Id. Although "[s]tatements made before a legislative committee are not conclusive proof of legislative intent," they do "provide guidance in interpreting the statute." People v. Rockwell, 125 P.3d 410, 419 (Colo. 2005). And "the testimony of a bill's sponsor concerning its purpose and anticipated effect can be powerful evidence of legislative intent." Vensor v. People, 151 P.3d 1274, 1279 (Colo. 2007).
¶23 In 2019, the General Assembly amended the CCJRA to make certain internal affairs records more accessible to the public. It enacted HB 19-1119, which provides:
Upon completion of an internal investigation, including any appeals process, that examines the in-uniform or on-duty conduct of a peace officer ... related to a specific, identifiable incident of alleged misconduct involving a member of the public, the entire investigation file, including the witness interviews, video and audio recordings, transcripts, documentary evidence, investigative notes, and final departmental decision is open for public inspection upon request; except that the custodian may first provide the requester with a summary of the investigation file and if, after reviewing the summary, the requester requests access to the investigation file, the custodian shall provide access to the entire investigation file subject to [the redaction provisions] of this section. § 24-72-303(4)(a) (emphasis added).
¶24 The parties submit that the main issue before us is who must identify the "specific, identifiable incident." EPCSO argues that the person seeking access to the files must do so. Sprinkle argues that the records custodian must identify the relevant files. For the reasons explained below, we conclude that the phrase "specific, identifiable incident," when read in context, refers to the types of incidents subject to investigation, not who must identify those incidents as part of a request to inspect investigation files. Therefore, the person requesting access to internal investigation files need not reference a "specific, identifiable incident" of alleged misconduct in the request.
¶25 This becomes apparent if we more broadly examine the language and structure of the Amendment, rather than immediately zooming in on a few words.
1. Plain Language
¶26 Using a wide lens, we first note that the Amendment begins by specifying the procedural status of files available for inspection: "[u]pon completion of an internal investigation, including any appeals process." A plain reading of this introductory phrase indicates that only files from completed investigations are available; thus, the statute does not provide for the release of files of ongoing or pending investigations. See also § 24-72-303(4)(e) ("[T]he custodian of an internal investigation file ... may deny inspection of the file if there is an ongoing criminal investigation or criminal case against a peace officer related to the subject of the internal investigation. The investigation file must be open for public inspection upon the dismissal of all charges or upon a sentence for a conviction." (emphasis added)).
¶27 The next phrase is set off in the sentence by commas and describes the subject matter of the investigation that was completed: "that examines the in-uniform or on-duty conduct of a peace officer ... related to a specific, identifiable incident of alleged misconduct involving a member of the public." § 24-72-303(4)(a). Because a limiting phrase set off by commas modifies the words immediately preceding it, Huffman v. City & Cnty. of Denver, 2020 COA 59, ¶ 16, 465 P.3d 108, 112, this phrase necessarily modifies "investigation." This means that the plain language of the Amendment encompasses a completed internal investigation into a specific, identifiable incident of alleged misconduct by a peace officer while that officer was in-uniform or on-duty and interacting with members of the public. Thus, the word "identifiable" is part of a limiting phrase that identifies the type of internal investigation that is at issue.
¶28 The legislature did not define "identifiable" in the CCJRA, so we assume that the legislature intended the word to have its common meaning. See Roalstad v. City of Lafayette, 2015 COA 146, ¶ 34, 363 P.3d 790, 796. The word "identifiable" means "capable of being identified." Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/identifiable; [https://perma.cc/PW6Q-Z2AQ]. In this context, because "identifiable" is within the phrase modifying "investigation," we read it as distinguishing an incident of alleged misconduct that is capable of being identified and investigated from one that is not (e.g., a vague allegation about an officer's general behavior on the job). The term does not relate to the records request but, rather, to the investigation. Thus, when read as a whole, we understand "identifiable" as describing a specific incident of alleged misconduct that is identifiable by the investigating officer so that the investigation could occur.
¶29 The Amendment then provides that "the entire investigation file ... is open for public inspection upon request." § 24-72-303(4)(a). And although the custodian "may" first provide a summary of the file, if the person seeking access reviews the summary and still requests access to the entire file, the custodian "shall" provide it. Id. So release of the files becomes mandatory. See Maine Cmty. Health Options v. United States, ––– U.S. ––––, 140 S. Ct. 1308, 1320, 206 L.Ed.2d 764 (2020) ("Unlike the word ‘may,’ which implies discretion, the word ‘shall’ usually connotes a requirement." (quoting Kingdomware Techs., Inc. v. United States, ––– U.S. ––––, 136 S. Ct. 1969, 1977, 195 L.Ed.2d 334 (2016) )); A.S. v. People, 2013 CO 63, ¶ 21, 312 P.3d 168, 174 ("Where both mandatory and directory verbs are used in the same statute, ... it is a fair inference that the legislature realized the difference in meaning, and intended that the verbs should carry with them their ordinary meanings. ... This is especially true where ‘shall’ and ‘may’ are used in close juxtaposition ...." (quoting Norman J. Singer & J.D. Shambie Singer, 3 Sutherland Statutory Construction § 57:11 (7th ed.) )).
¶30 Thus, read in its entirety, the plain language of the Amendment provides that any member of the public is entitled to inspect the entire file from any completed internal investigations into specific, identifiable instances of alleged officer misconduct while that officer was on-duty or in-uniform and interacting with the public. It doesn't require that people seeking to inspect the files know of the specific, identifiable instances of misconduct or that they include any such designation in their request. And we may not add such a requirement to the Amendment. See Oakwood Holdings, LLC v. Mortg. Invs. Enters. EEC, 2018 CO 12, ¶ 12, 410 P.3d 1249, 1252.
¶31 Based on the Amendment's plain language, we conclude that a records custodian for a criminal justice agency may not deny a request to inspect internal investigation files simply because the requesting party has not identified a specific incident of misconduct in their request.
¶32 But even if we were to assume that the word "identifiable" is ambiguous, our review of the legislative history yields the same conclusion.
2. Legislative History
¶33 The legislative history more fully illuminates the proponents' intent in passing the Amendment.
¶34 Before this amendment, records custodians presented with requests to access internal affairs records were expected "to consider and balance the public and private interests relevant to the inspection request." Harris v. Denver Post Corp., 123 P.3d 1166, 1174 (Colo. 2005) ; see also Freedom Colo. Info., Inc. v. El Paso Cnty. Sheriff's Dep't, 196 P.3d 892, 898-99 (Colo. 2008). We instructed custodians to consider multiple factors, including
the privacy interests of individuals who may be impacted by a decision to allow inspection; the agency's interest in keeping confidential information confidential; the agency's interest in pursuing ongoing investigations without compromising them; the public purpose to be served in allowing inspection; and any other pertinent consideration relevant to the circumstances of the particular request. Harris, 123 P.3d at 1175.
¶35 The sponsoring legislators' statements and the committee members' questioning of witnesses during hearings on the Amendment make it abundantly clear that the Amendment's proponents sought to eliminate custodians' discretion to deny access to certain internal affairs records and to make it easier for the public to obtain such records without involving the courts. Hearing on H.B. 1119 before the H. Judiciary Comm., 72d Gen. Assemb., 1st Sess. (Feb. 19, 2019) ("H. Judiciary Comm.") (statements of Rep. James Coleman, bill sponsor; and Rebecca Wallace, Policy Counsel, American Civil Liberties Union ("ACLU")). Representative Coleman stated that "this amendment removes the public interest exception, which is a primary basis on which law enforcement agencies currently refuse to release [internal investigation] files." Id. ; see also id. (statement of Donald Sissan, General Counsel, Colorado Fraternal Order of Police) (testifying against the Amendment but agreeing that it would remove the discretion previously given to records custodians).
¶36 During the committee hearings, several witnesses testified that custodians were not applying the Harris balancing test as intended. See H. Judiciary Comm. (statements of Denise Maes, Public Policy Director, ACLU; and Rebecca Wallace); Hearing on H.B. 1119 before the S. Judiciary Comm., 72d Gen. Assemb., 1st Sess. (Mar. 20, 2019) ("S. Judiciary Comm.") (statement of Margaret Kwoka, Faculty, University of Denver Sturm College of Law). Instead, custodians routinely denied requests for access with a blanket statement that it was not in the public interest to release the files. See H. Judiciary Comm. (statements of Denise Maes and Rebecca Wallace); S. Judiciary Comm. (statement of Margaret Kwoka).
¶37 Several witnesses testified that Denver was the only county in the state that allowed access to these types of records, but even that access had drastically declined over the decade preceding the Amendment. See H. Judiciary Comm. (statements of Denise Maes and Rebecca Wallace); S. Judiciary Comm. (statement of Margaret Kwoka).
¶38 Although some legislators and witnesses expressed concern that the proposed legislation would threaten officer privacy rights and personal safety, the Amendment's proponents maintained that it struck "a balanced compromise by protecting the sanctity of internal investigations while defending every Coloradan's right to public information about their public servants. This bill removes the ability to deny requests for a specific type of incident; however, [it] expands the ... redactions to protect officers' investigations and public safety." H. Judiciary Comm. (statement of Rep. James Coleman). The proponents emphasized that their goal was to improve transparency, fairness, accountability, and the public's trust in law enforcement. See S. Judiciary Comm. (statement of Sen. Mike Foote, bill sponsor). For example, Senator Foote described "the top values of this bill" by reading from a "recent" court case that said that "open access to internal affairs files enhances the effectiveness of internal affairs investigations rather than impairing them. Knowing that they will be scrutinized makes investigators do a better job and makes them and the department more accountable to the public. Transparency also enhances public confidence in the police department ...." Id.
¶39 Thus, by passing the Amendment, the General Assembly abrogated the balancing test of Harris and its progeny in this context. In other words, it eliminated the discretion previously granted to records custodians to deny CCJRA requests for certain internal investigation files.
¶40 The hearings also made clear that the proponents intended for the Amendment to grant access to anyone who asked for it, whether they were involved in the underlying incidents or not. In support, individuals from several local media outlets explained how they use these records. See H. Judiciary Comm. (statements of Noelle Phillips, News Editor, Denver Post; Jill Farschman, Chief Executive Officer, Colorado Press Association; and Chris Halsne, Investigative Reporter, multiple news outlets). For example, Ms. Farschman described her regular requests to the Denver police department for "every disciplinary letter [it has] issued this month." Id. Based on the contents of the letters, she would then decide whether to request additional documents or particular files. Id. Mr. Halsne testified that he often requested records to discover patterns of behavior within a department. Id. And Ms. Phillips described her broad requests when she was reporting on Denver's search for a new police chief several years ago. Id. Because all the candidates were internal, they all had internal affairs records that she could request. Id. After obtaining the records, she used the information in her reporting, which "contributed to the public discussion over who would be the best choice to lead the department." Id.
¶41 In sum, these media witnesses' testimony indicates that their routine practice was to request officer files without knowing what they would uncover; that is, without necessarily knowing of a specific, identifiable incident they wished to investigate. And the legislators' questioning of these witnesses doesn't indicate that the legislators had any concern with members of the public making such broad requests. Nothing in the legislative history suggests that a requester should have to identify a specific incident or that the Amendment makes such broad requests impermissible.
¶42 Thus, the Amendment's legislative history reflects the General Assembly's intent to provide broad access to completed internal investigation files regarding specific types of incidents of alleged officer misconduct, regardless of whether the person requesting access to the files can identify the specific incident.
III. Conclusion
¶43 The district court had subject matter jurisdiction, and the plain language and legislative history of the Amendment support the district court's application of the Amendment here.1 The district court properly ordered EPCSO to release the requested records to Sprinkle. We therefore discharge the rule.
JUSTICE SAMOUR dissents, and CHIEF JUSTICE BOATRIGHT joins in the dissent.
JUSTICE SAMOUR, dissenting.
¶44 The plain text of section 24-72-303(4)(a), C.R.S. (2020), makes clear that, in crafting that provision of the Colorado Criminal Justice Records Act ("CCJRA"), the legislature did not intend to sanction a criminal-justice-records version of "Go Fish." Because that kind of guessing game is the inevitable result of the majority's decision today, I respectfully dissent.1 ¶45 In 2019, the General Assembly amended CCJRA to make certain internal affairs records more accessible to the public. In doing so, it provided:
Upon completion of an internal investigation, including any appeals process, that examines the in-uniform or on-duty conduct of a peace officer ... related to a specific, identifiable incident of alleged misconduct involving a member of the public, the entire investigation file, including the witness interviews, video and audio recordings, transcripts, documentary evidence, investigative notes, and final departmental decision is open for public inspection upon request; except that the custodian may first provide the requester with a summary of the investigation file and if, after reviewing the summary, the requester requests access to the investigation file, the custodian shall provide access to the entire investigation file subject to [the redaction provisions] of this section. § 24-72-303(4)(a) (emphasis added).
¶46 The majority takes the untenable position that the legislature's use of the phrase "specific, identifiable incident" in subsection (4)(a) refers not to "who must identify those incidents as part of a request to inspect investigation files" but, instead, "to the types of incidents subject to investigation." Maj. op. ¶ 24. Using this misunderstanding as a foothold, the majority then posits that "identifiable" refers to being capable of being identified and investigated by the investigating officer. Id. at ¶ 28. Under the majority's view, this determination, in turn, yields the conclusion that "a records custodian for a criminal justice agency may not deny a request" on the ground that "the requesting party has not identified a specific incident of misconduct." Id. at ¶ 31. Because the majority's legal edifice sits atop a stack of unwarranted inferences, it cannot help but topple under scrutiny.
¶47 The practical effect of today's decision is to allow access to all completed internal investigation files regarding any incidents of alleged misconduct by a peace officer involving a member of the public. So long as a requester asks for all such files with respect to a named peace officer, he or she will be entitled to access them. Nowhere does the plain language of section 24-72-303(4) reflect that the legislature intended to authorize this type of fishing expedition. Instead, what the plain language of the statute reveals is that the legislature meant to require automatic disclosure of the contents of a responsive file upon receipt of a request "related to a specific, identifiable incident of alleged misconduct" by a peace officer "involving a member of the public." § 24-72-303(4)(a) (emphasis added).
¶48 While the majority cites the tenet of statutory interpretation requiring that we "read words and phrases in context and construe them according to the rules of grammar and common usage," maj. op. ¶ 22 (citing Thompson v. People, 2020 CO 72, ¶ 22, 471 P.3d 1045, 1051 ), its construction is not faithful to that principle. A commonsense reading of subsection (4)(a) supports an altogether different interpretation: A records request pursuant to CCJRA must itself be "related to a specific, identifiable incident of alleged misconduct," § 24-72-303(4)(a). And because the meaning of section 24-72-303(4)(a) is discernible on its face, we need not —and, in fact, may not —resort to tools of statutory construction to bolster an understanding unsupported by the text. See maj. op. ¶ 22 ("If the language is clear, we apply it as written.").
¶49 But in order to illustrate where the majority and I diverge, I must first explain where the majority and I align. And, because a thorough parsing of section 24-72-303(4)(a) entails multiple steps, each building upon the last, we start at the very beginning. After all, as noted by The Sound of Music's Maria, the beginning is "a very good place to start."2 ¶50 The beginning of subsection (4)(a) sets forth the following: "Upon completion of an internal investigation ... related to a specific, identifiable incident of alleged misconduct involving a member of the public, the entire investigation file ... is open for public inspection upon request ...."
¶51 First, like the majority, I understand the introductory portion of this subsection to "specify[ ] the procedural status" of the type of file available for inspection —namely, any file documenting an internal investigation that has been completed. Maj. op. ¶ 26. And, unsurprisingly, I agree with the majority on the corollary point: The statute does not provide for the inspection of any file in an "ongoing or pending" investigation. Id.
¶52 Second, the "internal investigation" referenced is modified by the adjectival phrase "related to a specific, identifiable incident of alleged misconduct involving a member of the public." § 24-72-303(4)(a) ; see Huffman v. City & Cnty. of Denver, 2020 COA 59, ¶ 16, 465 P.3d 108, 112 (explaining that a limiting phrase set off by commas modifies the words immediately preceding the phrase). On this point, too, the majority and I see eye to eye. Maj. op. ¶ 27.
¶53 Third, the "investigation file" referenced following the aforementioned qualification harkens back to the "internal investigation" described earlier in the sentence. Read in context, these words make plain that the "investigation file" designated as "open for public inspection" is one that "relate[s] to a specific , identifiable incident of alleged misconduct." § 24-72-303(4)(a) (emphasis added). The majority and I agree on this as well. See maj. op. ¶ 27 ("This means that the plain language of [subsection (4)(a)] encompasses a completed internal investigation into a specific, identifiable incident of alleged misconduct by a peace officer while that officer was in-uniform or on-duty and interacting with members of the public.").
¶54 Given our agreement on these three analytical steps —each of which is supported by the plain language of the statute — it is difficult to understand how the majority could land where it does. Here is where the majority strays: After its sound analysis, it turns back to the above-mentioned adjectival phrase and unexpectedly concludes that the word "identifiable" "identifies the type of internal investigation that is at issue," id., "describ[es] a specific incident of alleged misconduct that is identifiable by the investigating officer so that the investigation could occur ," and "distinguish[es] an incident of alleged misconduct that is capable of being identified and investigated from one that is not (e.g., a vague allegation about an officer's general behavior on the job)," id. at ¶ 28 (emphasis added).
¶55 While I discuss the myriad issues with the majority's position below, it is worth noting at the outset that, even under its own constraints, the majority uses the word "identifiable" in a way that engenders perplexing conclusions. For instance, is it the case that an investigating officer cannot feasibly identify and investigate allegations regarding general patterns of behavior? Under the majority's theory, which postulates that "identifiable" operates to "distinguish[ ] an incident of alleged misconduct that is capable of being identified and investigated from one that is not (e.g., a vague allegation about an officer's general behavior on the job)," id., that would appear to be the case. But logically, that can't be so —nothing prevents the investigation of allegations regarding general patterns of behavior that have been identified by complaints.
¶56 Even overlooking this peculiar aspect of the majority's approach, the interpretation of subsection (4)(a) endorsed today is problematic. The majority understands section 24-72-303(4)(a) as follows:
Upon completion of an internal investigation related to a specific, identifiable incident of alleged misconduct [i.e., a specific incident of alleged misconduct capable of being identified and investigated by the investigating officer] the entire investigation file is open for public inspection upon request.
But the majority cites no authority for the supposition it applies here (i.e., its definition of the word "identifiable"), and none exists. Yet, without this supposition, the resulting interpretation crumbles.
¶57 Indeed, if we use "a wide lens" and zoom out, as the majority invites us to do, maj. op. ¶ 26, there are a number of textual clues that point to the conclusion that "identifiable" was never intended to describe incidents that an investigating officer can identify and investigate, but was instead intended to convey that the requester must always identify the incident to which the requested investigation file pertains.
¶58 To begin, subsection (4)(a)'s overarching purpose is to describe any investigation file that must be disclosed in response to a records request, not to delineate what incidents are capable of being identified and investigated. See § 24-72-303(4)(a). The main subject of the first half of subsection (4)(a) (which, admittedly, is complex) is "the entire investigation file." Id. The reference to "an internal investigation" in that part of subsection (4)(a) serves only to better define which "investigation file" is publicly accessible (i.e., an "investigation file" that documents a "complet[ed]" internal investigation pertaining to "a specific, identifiable incident of alleged misconduct involving a member of the public"). Given this, the word "identifiable" is best understood as qualifying the nature of the investigation file the legislature has designated "open for public inspection," id., rather than the kind of incident an investigating officer can feasibly identify and investigate, maj. op. ¶ 28 (determining that "identifiable" means "identifiable by the investigating officer so that the investigation could occur").
¶59 To hold otherwise, as the majority does, is to adopt a temporally tortured reading of the statute that begs the question: Why would the legislature seek to qualify the nature of incidents that can feasibly be investigated (a process that would have necessarily concluded at the time of a viable section 24-72-303(4)(a) records request) in a subsection that outlines the kinds of files that are available for public inspection ? Of course, the most plausible answer happens to be the simplest one —it wouldn't. In light of the animating purpose of section 24-72-303(4)(a), it makes little sense to rule that "identifiable" qualifies the kind of incident that can feasibly be investigated, rather than the type of file that must be disclosed.
¶60 In fastening the investigating officer (rather than the requester of information) to the word "identifiable," maj. op. ¶ 28 (stating that the term "identifiable" relates not "to the records request but, rather, to the investigation"), the majority skirts the natural reading of subsection (4)(a) and fails to give effect to the legislature's intent. This has adverse consequences: Defining "identifiable" as capable of being identified by the investigating officer , while simultaneously permitting a requester to submit a request not tied to a specific incident, will necessarily result in the records custodian having to identify any incidents of alleged misconduct in response to a broad request.
¶61 Hence, despite the fact that the majority earlier suggests that "identifiable" refers to neither the requester nor the records custodian, id. at ¶ 24 (explaining that the phrase "specific, identifiable incident" does not refer to "who must identify those incidents as part of a request to inspect investigation files"), the inevitable result of its holding — that "a records custodian ... may not deny a request ... simply because the requesting party has not identified a specific incident of misconduct," id. at ¶ 31 — is that a records custodian will be required to identify any incidents of alleged misconduct in response to a broad request. But, in my view, there is no textual support — grammatical or otherwise —for accepting an interpretation under which a custodian must take it upon himself or herself to "identif[y]" incidents of alleged misconduct at the outset. See § 24-72-303(4)(a).
¶62 In fact, the opposite is true. A plain-text reading of the latter half of subsection (4)(a) proves my point. That half explains: The custodian, in response to a public records request, "may first provide the requester with a summary of the investigation file and if, after reviewing the summary, the requester requests access to the investigation file, the custodian shall provide access." Id. (emphases added). The least strained understanding of this part of subsection (4)(a), which is clearly focused on the file documenting a completed investigation, is that "identifiable" qualifies the investigation file being requested.
¶63 A context-driven construction of both halves of subsection (4)(a), then, yields the conclusion that the request itself must "relate[ ] to a specific, identifiable incident of alleged misconduct." In response to such a request, the custodian need only provide "a summary," rather than summaries, and produce the corresponding "investigation file," rather than multiple corresponding investigation files. See id. Splicing and dicing the subsection cannot cloud the legislature's choice to describe one public records request, corresponding to one investigation, with respect to one incident of alleged misconduct, as to which one summary may initially be provided, potentially resulting in the disclosure of one investigation file.
¶64 My understanding is further supported by the fact that the legislature did not outline a process whereby a custodian must determine which incidents fall within a more general, all-encompassing records request —a process that the majority's interpretation implicitly demands —or a procedure for challenging a custodian's determination if the requester suspects that not all of the files relevant to a broad request have been disclosed. Instead, the legislature contemplated only a situation where a requester knows that information has been withheld or redacted (because, at the outset, the request itself pertained to a specific , identifiable incident of alleged misconduct involving a member of the public):
Any person who has been denied access to any information in a completed internal affairs investigation file may file an application in the district court in the county where the records are located for an order directing the custodian thereof to show cause why the withheld or redacted information should not be made available to the applicant. § 24-72-303(4)(f) (emphasis added). When the legislature means to set out a process that could, in practice, involve either one file or multiple files, it knows how to say so. See, e.g., § 8-2-129(1), C.R.S. (2020) (permitting an employee "to inspect and obtain ... his or her own personnel file or files" (emphasis added)). That it didn't opt to include similar language here speaks volumes about its intent.
¶65 In sum, the plain meaning of the language in subsection (4)(a) leads to the conclusion that a CCJRA records request must itself be "related to a specific, identifiable incident of alleged misconduct involving a member of the public." See § 24-72-303(4)(a) (emphasis added). The majority's more expansive interpretation will almost certainly promote unsupported fishing expeditions and inevitably result in a contentious and confusing process unsanctioned by a commonsense reading of section 24-72-303(4)(a). And while I fully support increased transparency of and public access to criminal justice records, I cannot get behind the majority's far-reaching result.
¶66 For the reasons articulated in this opinion, I respectfully dissent. I fear that today's decision will have undesirable consequences the legislature neither considered nor intended.
I am authorized to state that CHIEF JUSTICE BOATRIGHT joins in this dissent.
1 EPCSO also asserts that the district court erred for ordering disclosure of the requested records under the SDT because Sprinkle failed to demonstrate a "reasonable likelihood that documents existed and contained material evidence." However, we, like the district court, have resolved the matter under the CCJRA; therefore, any alleged error regarding the SDT is moot. See People ex rel. Rein v. Meagher, 2020 CO 56, ¶ 14, 465 P.3d 554, 558.
1 I don't address the subject matter jurisdiction issue because I see the application-filing provision, section 24-72-303(4)(f), as a non-jurisdictional procedural requirement that was waived here.
2 The Sound of Music (20th Century Fox 1965) (from the well-loved classic "Do Re Mi").