Wayne HARRIS; Katherine Harris; Thomas Klebold; Susan Klebold; Theodore B. Mink, III, in his capacity as Sheriff of Jefferson County, Colorado; and Jefferson County Sheriff's Department, Petitioners,

v.

The DENVER POST CORPORATION, d/b/a the Denver Post, Respondent.

No. 04SC133.

Supreme Court of Colorado.

Nov. 15, 2005.

Montgomery, Kolodny, Amatuzio & Dusbabek, L.L.P., C. Michael Montgomery, Brooke H. Woodward, Steven G. Greenlee, Denver, for Petitioners Wayne Harris and Katherine Harris.

Patterson Nuss & Seymour P.C., Franklin D. Patterson, Gregg E. Kay, Englewood, for Petitioners Thomas Klebold and Susan Klebold.

Frank J. Hutfless, Jefferson County Attorney, Lily W. Oeffler, Assistant County Attorney, Writer Mott, Assistant County Attorney, Golden, for Petitioners Theodore B. Mink, III, in his capacity as Sheriff of Jefferson County and Jefferson County Sheriff's Department.

Faegre & Benson LLP, Thomas B. Kelly, Steven D. Zansberg, Denver, for Respondent The Denver Post Corporation.

Colorado District Attorneys' Council, Robert S. Grant, Executive Director, Denver, Mary Lacy, District Attorney, Twentieth Judicial District, William F. Nagel, Assistant District Attorney, Boulder, for Amicus Curiae Colorado District Attorneys' Council.

Baker & Hostetler LLP, Marc D. Flink, Casie D. Collignon, Denver, for Amici Curiae Colorado Press Association and the Colorado Freedom of Information Council.

John W. Suthers, Attorney General, Allison Eid, Solicitor General, Elizabeth H. McCann, Deputy Attorney General, Denver, for Amicus Curiae Colorado Attorney General John W. Suthers.

HOBBS, Justice.

We granted certiorari to review the court of appeals' judgment in *Denver Post Corp. v. Cook*, 104 P.3d 293 (Colo.App.2004).[1] Joined by the Jefferson County Sheriff's Department ("Sheriff"), Wayne and Katherine Harris and Thomas and Susan Klebold ("Harris and Klebold") challenge the appellate court's decision that recordings made by their sons and seized by the Sheriff pursuant to a valid search warrant from their home are public records under Colorado's Open Records Act (CORA), §§ 24–72–201 to –206, C.R.S. (2005). In April of 1999, Eric Harris and Dylan Klebold killed twelve students and a teacher at Columbine High School. They then killed themselves. Referred to as "the basement tapes," these recordings include video and

audio tapes evidencing the plotting for and preparation of the murders.

Harris and Klebold and the Sheriff also contend that the recordings cannot be made available for public inspection under Colorado's Criminal Justice Records Act (CCJRA), §§ 24–72–301 to –309, C.R.S. (2005). Agreeing with this contention, the District Court for Jefferson County ruled that the recordings were private property and not criminal justice records, and that the Sheriff could not disclose them under the CCJRA.

In its initial opinion, the court of appeals held that the recordings were subject to the CCJRA. After a petition for rehearing, the court reconsidered and held that the recordings were subject not to the CCJRA but to CORA. We agree with Respondent Denver Post Corporation ("Denver Post") that the records are subject to the CCJRA, not CORA.

Because the Sheriff obtained the recordings pursuant to a search warrant that has not been invalidated, and used them to investigate crimes connected with the Columbine killings, they are criminal justice records under the CCJRA and are subject to the Sheriff's exercise of sound discretion to allow the requested inspection or not, utilizing a balancing test taking into account the relevant public and private interests. We remand this case to the court of appeals with directions for the district court to order the Sheriff to determine under the CCJRA whether or not to allow the Denver Post's inspection request.

**I.**

In 1999, Eric Harris and Dylan Klebold shot and killed thirteen people and wounded twenty-one others at Columbine High School in Jefferson County, Colorado, before they killed themselves. As part of its investigation into the murders and how they were planned and executed, the Sheriff obtained a

---

1. The issues on review are:
 1. Whether the court of appeals erred in holding that privately owned personal property seized from a private home by the government pursuant to search warrant is a "public record" subject to the Colorado Open Records Act (CORA).

2. Whether the recordings seized from private homes by virtue of search warrants and for the purposes of criminal investigation are "criminal justice records" subject to the Colorado Criminal Justice Records Act (CCJRA), sections 24–72–301 to –309, C.R.S. (2005).

search warrant. The Sheriff seized many items of evidence, including the recordings Eric Harris and Dylan Klebold made of their murder preparation.

In 2000, families of victims sought disclosure of the seized evidence. The Sheriff declined, asserting section 24–72–304(1) of the CCJRA prevented disclosure of evidence in the course of an on-going criminal investigation. At that time, the Sheriff was investigating persons who may have assisted Eric Harris and Dylan Klebold in obtaining murder weapons. The victims' families then filed a suit in the trial court under CORA for access to the evidence.

The trial court granted the Harris and Klebold motions to intervene. The Denver Post also intervened, requesting access to evidence seized from the Harris and Klebold homes. At no time after the seizure did Harris and Klebold challenge the legality of the search warrant or the Sheriff's execution of it.

In its conclusions of law, the trial court explained its ruling denying access. It refused the Denver Post's request because the items seized through the warrant were private property and never, at any point, became criminal justice records:

> The pending request presents a significant and important legal issue: whether documents obtained by law enforcement agencies by means of a court-ordered search warrant are "criminal justice records" and therefore available for public examination under the Criminal Justice Records Act. . . .

> Before examining the statute it is important to realize what the Post is requesting. These records were obtained by the Sheriff's Office under the authority of a search warrant. If records seized pursuant to a search warrant are "criminal justice records," they automatically are available for public inspection by anyone who cares to see them (unless a court finds that one of the limited statutory exceptions applies). This would be true whether or not the records turn out to be relevant to the suspected crime and, indeed, whether or not the owner or possessor of the records is guilty of anything.

The Sheriff returned many of the items seized from the Harris and Klebold homes, but inspection of the recordings was still at issue on the Denver Post's appeal to the court of appeals.

The court of appeals initially ruled that the recordings were not subject to CORA but were subject to the CCJRA, and remanded for the district court to determine whether the Sheriff held the evidence "for use in the exercise of functions required or authorized by law or administrative rule." On petition for rehearing, the appellate court held that the recordings were not criminal justice records; nevertheless, they were public records subject to disclosure under CORA. The court of appeals reasoned, in part, as follows:

> Here, there is no dispute that the recordings are the private property of the families and that the [Sheriff] holds them in its official capacity. There is also no dispute that the recordings were lawfully acquired and were used by the [Sheriff] in the normal course of its investigation of the Columbine tragedy. Portions of the "basement tapes" were used in the preparation of the sheriff's final report and in the sentencing hearing of the individual convicted of providing weapons to the boys. In addition, while the recordings may be severable from the rest of the investigative files, we conclude that they have become a part of the investigative records "made, maintained, or kept" by the [Sheriff].

> While there are certainly parallels between the recordings and diaries the boys might have wished to keep private, there are also parallels between them and a self-aggrandizing manifesto the boys might have wished, even ached, to be made public.

> We conclude that the recordings are public records subject to the disclosure requirements and limitations of CORA.

*Denver Post Corp. v. Cook,* 104 P.3d 293, 298 (Colo.App.2004).

Harris, Klebold, and the Sheriff seek reversal of the court of appeals' determination that CORA applies to the recordings. They argue for reinstatement of the trial court's

ruling that the recordings are private and not subject to CORA or the CCJRA, that inspection must therefore be denied, and that the recordings be returned to Harris and Klebold. The Denver Post agrees that the court of appeals erred in concluding that the recordings are subject to CORA; instead, it argues that the recordings are subject to the Sheriff's discretion under the CCJRA to allow inspection of the recordings. We agree with the Denver Post.

## II.

Because the Sheriff obtained the recordings pursuant to a search warrant that has not been invalidated and used them to investigate crimes connected with the Columbine killings, they are criminal justice records under the CCJRA and are subject to the Sheriff's exercise of sound discretion to allow the requested inspection or not, utilizing a balancing test taking into account the relevant public and private interests.

### A.

### Standard of Review

▆▆▆▆ We review de novo questions of law concerning the correct construction and application of CORA and the CCJRA. *Denver Publ'g Co. v. Bd. of County Comm'rs,* 121 P.3d 190, 195 (Colo.2005). Our duty is to effectuate the General Assembly's intent, giving all the words of the statutes their intended meaning, harmonizing potentially conflicting provisions, and resolving conflicts and ambiguities in a way that implements the legislature's purpose. *Id.*

### B.

### CORA and CCJRA Differentiated

We decided the *Denver Publishing* case after the district court and court of appeals rendered their decisions in the case now before us. Our review of the statutory and legislative history led us to hold in *Denver Publishing* that the General Assembly in CORA did not intend to include within the definition of a public record the private content of romantic e-mail messages between two public officials. *Id.,* at 205. We held

that the General Assembly required e-mails from a public official to have "a demonstrable connection to the performance of public functions or involve the receipt or expenditure of public funds" in order for them to become public records under CORA. *Id.,* at 203.

Harris and Klebold have not challenged the validity of the search warrant or the relevancy of the seized recordings to the Sheriff's investigation. They simply contend that the recordings are their private property and must be returned without the opportunity for public inspection. We disagree with this contention, but we also disagree with the court of appeals' ruling that CORA applies to evidence seized from the Harris and Klebold homes.

▆▆▆▆ In contrast to the facts in *Denver Publishing,* the content of the records sought to be inspected here relate directly to the Sheriff's authority to investigate the Columbine crimes and they are relevant to that investigation. The Fourth Amendment to the United States Constitution and Colorado statutes and rules allowed the Sheriff to obtain these recordings for the public purpose of criminal investigation. U.S. Const. amend. IV; Colo. Const. art. 2, § 7; §§ 16-3-301 to -305, C.R.S. (2005). A person's privacy interest in his home and personal effects is subject to reasonable governmental intrusion when the police enter and obtain evidence of a crime pursuant to a warrant based on probable cause. *See People v. Altman,* 960 P.2d 1164, 1167 (Colo.1998). As a consequence, evidence of crime necessarily loses its entirely private character when a criminal justice agency lawfully obtains it for use in a criminal investigation and/or prosecution on behalf of the public.

▆▆▆▆ Reviewing the two statutes, we determine that the recordings at issue in this case are criminal justice records under the CCJRA, and CORA is not applicable. CORA explicitly excludes criminal justice records from the definition of public records: " 'Public records' does not include ... [c]riminal justice records that are subject to the provisions of part 3 of this article ...." § 24-72-202(6)(b)(I), C.R.S. (2005). Although similar in many respects, key defini-

tions of CORA and the CCJRA differ in a fundamental way. Criminal justice records are restricted to those "made, maintained, or kept by any criminal justice agency." *Id.* § 24–72–302(4). Public records are those made, maintained, or kept by the State or one of several listed entities, but does not include criminal justice records. *Id.* § 24–72–202(6)(a)(I).

The CCJRA defines criminal justice records as follows:

all books, papers, cards, photographs, tapes, recordings, or other documentary materials, regardless of form or characteristics, *that are made, maintained, or kept by any criminal justice agency in the state for use in the exercise of functions required or authorized by law or administrative rule,* including but not limited to the results of chemical biological substance testing to determine genetic markers conducted pursuant to sections 16–11–102.3, 16–11–104, 16–11–204.3, 16–11–308(4.5), 17–2–201(5)(h), and 17–22.5–202(3)(b.5)(II) and (3.5), C.R.S.

*Id.* § 24–72–302(4) (emphasis added).

CORA defines public records as follows:

*all writings made, maintained, or kept by the state, any agency, institution, a nonprofit corporation* incorporated pursuant to section 23–5–121(2), C.R.S., *or political subdivision of the state,* or that are described in section 29–1–902, C.R.S., and *held by any local government-financed entity for use in the exercise of functions required or authorized by law or administrative rule or involving the receipt or expenditure of public funds.*

*Id.* § 24–72–202(6)(a)(I) (emphasis added).

The legislature enumerated several considerations underscoring the purposes for its CCJRA enactment. "[T]he maintenance, access and dissemination, completeness, accuracy, and sealing of criminal justice records are matters of statewide concern . . . ." *Id.* § 24–72–301(1). The General Assembly enumerated not just "access and dissemination" but "sealing" of criminal justice records as "matters of statewide concern."

This distinction between CORA and the CCJRA is further highlighted by the inclu-sion of an additional public policy consideration in the CCJRA:

It is further declared to be the public policy of this state that criminal justice agencies shall maintain records of official actions . . . and that such records shall be open to inspection by any person and to challenge by any person in interest, . . . and that all other records of criminal justice agencies in this state may be open for inspection as provided in this part 3 or as otherwise specifically provided by law.

*Id.* § 24–72–301(2). Accordingly, the legislature has expressly stated its intent that records of "official actions" *shall* be open to the public for inspection, while "all other records of criminal justice agencies" *may* be open for inspection subject to certain exceptions.

Finally, the legislature established different procedures when the custodians of public records and criminal justice records deny access to those records. If the custodian of public records denies access and the requesting entity seeks a court order directing the custodian to allow access, the custodian under CORA *must* pay the requesting party's reasonable costs and attorney fees unless the court determines that denial of access was proper. *Id.* § 24–72–204(5). In contrast, if the custodian of criminal justice records denies access, it is only required to pay the requesting party's reasonable costs and attorney fees under the CCJRA if the court finds that the denial was improper and was arbitrary and capricious. *Id.* § 24–72–305(7). This additional restriction imposed on the requester of criminal justice records reinforces the legislative policy that access to criminal justice records is more limited than access to public records.

In reversing the court of appeals' conclusion that CORA applies to the recordings in this case, we also look to the circumstances under which the General Assembly enacted the CCJRA in 1977, as we did in *Denver Publishing,* at 196–99. *See* § 2–4–203(1)(b), C.R.S. (2005) (court may consider circumstances under which the statute was enacted). The federal government provided the initial impetus for the CCJRA with passage of the Crime Control Act of 1973. Criminal Justice Records Act: Hearing on H.B. 1597

Before the House Judiciary Committee, 51st Gen. Assem. of Colo. (1977) (statement of Gary Pond, Division of Criminal Justice) (audio recording). The new federal law required state compliance to receive federal funds; compliance in part required creation of a scheme for managing and disseminating criminal records information. *Id.* Because Colorado legislators did not believe the existing statutory provisions of CORA met the federal requirement, *id.*, they enacted the CCJRA.

In adopting the CCJRA, the General Assembly created the separate "criminal justice records" category, Criminal Justice Records Act, ch. 340, sec. 1, § 24–72–302, 1977 Colo. Sess. Laws 1244, 1245, and excluded those records from the statutory definition of CORA public records, ch. 340, sec. 2, § 24–72–202, 1977 Colo. Sess. Laws 1244, 1250 ("[Public records] does not include criminal justice records which are subject to the provisions of Part 3 of this article."). The legislature added this separate Part Three to Article 72, Title 24, to address criminal justice records and records of official actions of criminal justice agencies. In doing so, the legislature adopted a definition of criminal justice records that remains substantially unchanged to the present, and placed the decision whether to disclose criminal justice records within the sound discretion of the custodian, subject to certain exceptions.

█ Thus, if a criminal justice entity is making, maintaining, or keeping the record sought to be inspected, the General Assembly has provided that it is not a public record subject to CORA. § 24–72–202(6)(b)(I), C.R.S. (2005). Rather, the questions to be answered are whether the record sought to be inspected is a criminal justice record under the CCJRA and, if so, whether or not the Sheriff may allow its inspection.

Nevertheless, because CORA and the CCJRA are similarly constructed, we look to our analysis in *Denver Publishing* for help in understanding the General Assembly's intent on questions of the CCJRA's applicability. We also look to our pre-*Denver Publishing* CORA decision in *Wick Communications Co. v. Montrose County Board of County Com-*

*missioners,* 81 P.3d 360 (Colo.2003), for guidance.

## C.

### Burden of Demonstrating Capacity and Function in which the Records are Held and Used

█ The entity requesting inspection of the items has the initial burden to show that they are likely "criminal justice records" under the terms of the act. *See, e.g., Denver Publishing,* at 199–200. In what capacity the custodian makes, maintains, or keeps and uses the record is the linchpin to this inquiry. "We hold that in cases where it is not clear whether the custodian holds a record in an individual or official capacity, and thus whether the record is private or public, the requesting party must make a threshold showing that the document is likely a public record." *Wick,* 81 P.3d at 364. This threshold showing is not "overly burdensome." *Id.* "Where the agency is the custodian of the records sought and the records are 'made, maintained, or kept' *in a public capacity,* the burden to show that the records are likely public records has been met." *Denver Publishing,* at 199 (emphasis added).

The burden then shifts to the custodian to show whether the items in contention "relate to the performance of public functions." *Id.* at 199. The agency must look to the content of the records to resolve whether they relate to the performance of public functions. *Id.* Here there is no question that the Sheriff holds the recordings in his official capacity.

## D.

### Sheriff's Public Capacity and Function

Under Colorado law, a sheriff is an officer of the county, the head of a law enforcement agency, and a peace officer. §§ 30–10–501 to –523, 16–2.5–103, C.R.S. (2005). A fundamental function of a peace officer and his or her criminal law enforcement agency is to investigate crimes. Consequently, a peace officer may obtain a search warrant from a court upon proper application, execution, and return. *Id.* §§ 16–3–301 to –305. Once a peace officer obtains a search warrant, he or

she is authorized, in fact commanded, to "search the person, premises, place, property, or thing described in the search warrant and to seize property described or identified therein." *Id.* § 16–1–104(16).

A sheriff's department is a "criminal justice agency" under the CCJRA. *Id.* § 24–72–302(3) (including within the definition of a "criminal justice agency" any "law enforcement authority which performs any activity directly relating to the detection or investigation of crime"). A sheriff's department is the "official custodian" of "criminal justice records," § 24–72–302(8), C.R.S. (2005), that "are made, maintained, or kept ... for use in the exercise of functions required or authorized by law or administrative rule," *id.* § 24–72–302(4); *see Johnson v. Colo. Dep't of Corr.*, 972 P.2d 692, 694 (Colo.App.1998).

In the case before us, seizure of the recordings was demonstrably within the Sheriff's public capacity and function to investigate crimes connected to the Columbine killings and the content of the recordings was relevant to that investigation as evidence of how Eric Harris and Dylan Klebold planned and carried out their crimes and whether they were assisted by other persons.[2] Instead of focusing on whether the Sheriff (a) was using the recordings in its public capacity in the performance of a public function, and (b) had the authority to allow or deny public access to them under the provisions of the CCJRA, the district court assumed that subjecting seized private records to the CCJRA would require all seized private records to be made public on request, despite privacy interests involved. But, the CCJRA is not nearly so preemptive of property and privacy interests.

Had the trial court or any other court of law ruled that the recordings seized through the search warrant were obtained illegally and ordered their return to the owner with no public inspection being allowed, they would not be criminal justice records that the Sheriff had the discretion to disclose under section 24–72–305(1). Such a circumstance would trigger the exception stated in section 24–72–305(1)(b), which prohibits inspection when "by order of any court."

 Here, Harris and Klebold simply contend that private records seized by a search warrant are not criminal justice records. Absent a court determination that the search warrant was improperly issued,[3] such a position is patently contrary to law that allows the government to intrude upon a person's privacy and validly seize evidence of a crime, though it be private property, for investigation and/or prosecutorial purposes. *See, e.g., People v. D.F.*, 933 P.2d 9, 16 (Colo.1997).

As the *Denver Publishing* case instructs, at 196, we must determine whether the custodian was keeping the records "for use in the exercise of functions required or authorized by law or administrative rule." Despite

2. The Sheriff's Final Report, released May 15, 2000, addressed the tapes as follows:

> Harris and Klebold left behind videotapes documenting many of their plans, their activities and their philosophies. One of the tapes was almost two hours long and taped on three separate occasions in March 1999. The second tape, about 22 minutes in length, was shot on two separate occasions on April 11 and 12, 1999. The third tape, 40 minutes long, was taped on eight separate occasions from early April 1999 to the morning of April 20, 1999. Harris and Klebold taped a tour of Harris's bedroom and showed off their weapons and bombs. They recorded each other conducting dress rehearsals and they taped the drive in Harris's car to buy supplies needed for their plans.
>
> While talking to the camera, Harris and Klebold laughed at how easy it was to make other people believe what they wanted them to. They talked about how "evolved" they were

and how they considered themselves to be "above human." They said they were going to be successful because they were going to die and stressed that they had been planning the Columbine shootings for over eight months, before all the other school shootings had occurred.

> Klebold and Harris both talked on camera about the rage and anger that had built up for years and declared they would destroy the world if they could. Harris asserted that, "There is nothing that anyone could have done to prevent this. No one is to blame except me and Vodka." He went on to say that their actions were "a two man war against everyone else."

3. Criminal Procedure Rule 41(e) allows a person aggrieved by an unlawful search and seizure to petition a district court for return of the property, even before criminal proceedings have begun. *See, e.g., Search Warrant for 2045 Franklin v. Early*, 709 P.2d 597, 599 (Colo.App.1985).

arguments to us that the Sheriff was merely possessing the recordings pending their return, the record in this case reveals that the Sheriff used the content of the recordings in investigating the murders, bringing charges against an individual who helped Eric Harris and Dylan Klebold obtain the weapons they used in the crimes, and making its report to the public concerning the crimes.

## E.

## CCJRA Disclosure Restrictions

While we conclude that the recordings sought to be inspected in this case are criminal justice records because the Sheriff validly obtained them and their content was relevant to the criminal investigation the Sheriff conducted, this does not mean the Sheriff must allow their inspection. To the contrary, the CCJRA establishes procedures and criteria governing the inspection of criminal justice records. In enacting the CCJRA, the General Assembly was aware of the public responsibility the law places on criminal justice agencies to investigate, report on, and prosecute criminal acts. It was also aware that privacy interests and the need for investigative secrecy may dictate non-disclosure to the public of criminal justice records at a particular phase of the investigation or judicial proceeding, or at all.

In enacting the CCJRA, the legislature created two categories of documents-records of official actions and criminal justice records-and established disparate disclosure standards for each. As with public records in CORA, the legislature mandated that records of official actions be disclosed if requested. § 24–72–303(1), C.R.S. (2005). The legislature did *not*, however, mandate disclosure of criminal justice records. Rather, it prohibited inspection of some criminal justice records while allowing the custodian, exercising sound discretion, to permit inspection of other criminal justice records. *Id.* §§ 24–72–304(1), –305(1), –305(1.5).

Subsections 24–72–305(1)(a) and (b) prevent disclosure of the record if inspection is contrary to any state statute or is prohibited by rules of this court or by the order of any court. The rape shield statute is an example of a statute prohibiting disclosure during certain phases of the investigation and criminal justice proceedings, or at all. *See People v. Bryant,* 94 P.3d 624, 630–31 (Colo.2004). An order suppressing documentary evidence of criminal activity, prohibiting its use, and requiring its return to the person from whom it was seized, because of an unconstitutional search and seizure, is an example of a court order that would not permit inspection of the record. *See People v. Mason,* 989 P.2d 757, 759 (Colo.1999) (concerning reasonable expectation of privacy in personal banking records). In addition, the legislature has regulated the release of information related to sexual assault cases, § 24–72–304(4), C.R.S. (2005), criminal history records of volunteers and employees of charitable organizations, *id.* § 24–72–305.3, criminal history records of applicants in regulated professions or occupations, *id.* § 24–72–305.4, and the results of chemical biological substance testing to determine the genetic markers, *id.* § 24–72–305(1.5). Also, the General Assembly has provided a means in the CCJRA to seal records. *Id.* § 24–72–308.

Subject to the exceptions provided by law, the General Assembly has consigned to the custodian of a criminal justice record the authority to exercise its sound discretion in allowing or not allowing inspection. *Id.* §§ 24–72–304(1), –305(1). In granting such discretion, the legislature intended the custodian to consider and balance the public and private interests relevant to the inspection request.

The legislature's preference for such a balancing test appears in the statutory provisions relating to sealing a criminal justice record. Where a "person in interest" has not been convicted of the crime charged, he or she may request that the records of official action relating to the arrest be sealed. § 24–72–308(1), C.R.S. (2005). In such a case, the court hearing the petition must balance "the harm to the privacy of the petitioner or dangers of unwarranted adverse consequences to the petitioner" against "the public interest in retaining the records." *Id.* § 24–72–308(1)(c).

In *People v. Bushu,* 876 P.2d 106 (Colo. App.1994), the court of appeals reviewed the

factors for a court to consider when determining whether to seal a record as set forth in the statutory provisions. These include "the severity of the offense, the time lapsed since the conviction, the subsequent criminal history of the petitioner, and the need for the government agency to retain the records." *Id.* at 107–08. The court of appeals also looked to other factors courts have considered in balancing individual harm and the public interest. These factors include

> the strength of the government's case against the petitioner; the petitioner's age and employment history; the specific adverse consequences the petitioner may suffer if the records are not sealed, for example, the social stigma involved in an arrest record, the likelihood of increased police scrutiny in later investigations, the use of records by judges in making decisions regarding sentencing, granting bail, or release pending appeal, and the effect of an arrest record in seeking employment.

*Id.* at 108.

Although the legislature did not specifically establish a balancing test in the CCJRA discretionary provisions for considering release of a criminal justice record for public inspection or not, such a test inheres in the statutory grant of discretion itself and in the careful manner by which the General Assembly has structured the CCJRA's disclosure and non-disclosure provisions.

 If the content of a private record seized from an individual is not relevant to performance of the criminal justice agency's public function, it is not subject to inspection.[4] However, if the record is relevant to the agency's public function and the agency obtained the record in its public capacity, and no statute or court order prohibits inspection, the custodian may consider releasing the record in response to an inspection request. Concerns about allowing inspection of seized private records are properly addressed when the party resisting inspection

and the party requesting inspection air their interests with the custodian. To accomplish this, and because seized records are private property even when they are properly used for public purposes, the custodian must notify the owner of the seized records of the inspection request before making the statutory determination assigned to it.

 In making this statutory determination, the custodian takes into account and balances the pertinent factors, which include the privacy interests of individuals who may be impacted by a decision to allow inspection; the agency's interest in keeping confidential information confidential; the agency's interest in pursuing ongoing investigations without compromising them; the public purpose to be served in allowing inspection; and any other pertinent consideration relevant to the circumstances of the particular request. A decision to allow or not allow inspection of the record is subject to judicial review under an abuse of discretion standard. *See Bushu,* 876 P.2d at 107.

 Because the Sheriff in its public capacity validly obtained and used the recordings in performance of its public function to investigate the commission of crimes at Columbine High School by Eric Harris and Dylan Klebold, we hold that they are criminal justice records subject to the CCJRA's inspection provisions.

### III.

Accordingly, we reverse the judgment of the court of appeals and remand this case with directions for the district court to order the Sheriff to determine under the CCJRA whether or not to allow the Denver Post's inspection request.

---

4. In *Denver Publishing,* we held that private records do not become public records simply because the agency's public report referred to them. 121 P.3d at 201 n. 10. In the case before us, the public capacity and performance criteria of *Denver Publishing* are met. We recognize that the owner of a private record validly seized has standing to contest the public inspection of that record, whether or not he or she would have standing to file a motion for sealing under section 24–72–308(1).